# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Core and Main LP,<br><br>          Plaintiff,<br><br>v.<br><br>Ron McCabe and<br>Dakota Supply Group, Inc.<br><br>          Defendants. | Case No. 21-cv-01512-WMW-DTS<br><br><br>**DEFENDANTS' MEMORANDUM<br>OF LAW IN SUPPORT OF THEIR<br>JOINT MOTION TO DISMISS,<br>OR, IN THE ALTERNATIVE,<br>FOR SUMMARY JUDGMENT** |

## <u>INTRODUCTION</u>

Core and Main's[1] Complaint relies on innuendo and obfuscation attempting to overcome its failure to provide any evidence, credible allegations, or support in the law for its claims. The claims in this action largely rely on an Employment Agreement signed by McCabe on October 2, 2017, that was never executed by Core & Main's CEO as required by the controlling language Core & Main drafted. And Core & Main's Complaint fails to inform the Court that McCabe and Core & Main's CEO did execute a Noncompetition Agreement, covering the same subject matter as the Employment Agreement, ***four days after*** McCabe signed the Employment Agreement or that this later agreement superseded and replaced the Employment Agreement altogether.

Lacking any legitimate interest to justify the restrictive covenants in the Employment Agreement, the Complaint asks the Court to reuse and recycle the interest

---

[1] The following abbreviations are used in this memorandum: Plaintiff Core and Main LP will be referred to as "**Core & Main;**" Defendant Ron McCabe, as "**McCabe;**" and Defendant Dakota Supply Group, Inc. as "**DSG;**" and DSG and McCabe, collectively as "**Defendants**").

that were already sufficiently protected by the Noncompetition Agreement's restrictions that expired in 2019. Core & Main cannot extend the need for such restrictions another three years merely by pretending the expired restrictions never existed.

Core & Main's other claims fare no better. They must be dismissed because the Complaint cannot fulfill the most basic application of the *Iqbal/Twombly* standard. The Complaint cannot succeed by alleging that McCabe had to have disclosed confidential information based solely on the fact that he resigned and expressed generic concerns regarding Core & Main's business practices. Core & Main similarly alleges McCabe breached Minnesota's common law duty of loyalty based on demonstrably inaccurate double hearsay because it failed to consult first-hand sources available to the company and its agents. And, to top off the implausible Complaint allegations, Core & Main alleges that McCabe's mere existence in this industry—such as providing volunteer training on products that are sold by Core & Main, but not by DSG—constitutes *per se* unlawful solicitation without any allegation related to sales, attempted sales, solicitation, attempted solicitation, or any direct or indirect action that could be construed as solicitation or sales.

Core & Main's Complaint must be dismissed because its claim fails as a matter of law. Defendants jointly ask the Court to dismiss Core and Main's Complaint with prejudice pursuant to Rule 12(b)(6), Rule 12(d), or Rule 56 of the Federal Rules of Civil Procedure .

## BACKGROUND FACTS AND ALLEGATIONS[2]

### I.    The Parties

Core & Main is a Florida limited partnership with its principal place of business in St. Louis, Missouri. (ECF 1, Ex. A, Complaint ("Compl.") ¶1.) The company is a "distributor of water, wastewater, storm drainage and fire protection products, and related services, [*sic*] to municipalities, private water companies and professional contractors across municipal, non-residential and residential end markets nationwide." (Core & Main, Inc., Form S-1 Registration Statement p. 1 (May 21, 2021) (available at https://www.sec.gov/Archives/edgar/data/0001856525/000119312521169332/d70382ds1.htm) (hereinafter "May 2021 Form S-1"); *see also* Compl. ¶1.) Core & Main has "approximately 285 branch locations in 47 states" and "over 60,000 customers." (May 2021 Form S-1 p. 121.)

According to Core & Main, its national scale provides significant advantages over regional industry participants. As it explained to prospective investors in its Form S-1 filed with the SEC in anticipation of an initial public offering:

> [W]e are the largest volume customer for many of our suppliers, leading to favorable purchasing arrangements regarding product availability, payment terms and pricing. Our scale also enables us to secure exclusive or restrictive distribution rights in key product categories and to provide key products to customers that are unavailable to our competitors. We believe that our size and scale, supplier relationships and technical knowledge of products and local specifications enable us to obtain preferred access to

---

[2] This background is taken from Core & Main's Complaint and materials appropriately considered on a motion to dismiss. *See infra* p. 14, and cases cited. Defendants dispute many of Core & Main's allegations. However, for purpose of this motion and consistent with standards applicable to both Rule 12 and Rule 56 of the Federal Rules, Defendants accept Core & Main's allegations as true on disputed points.

specialized products and preferred access to products during periods of material shortages or when shorter-than-usual lead times are required for certain projects. This provides us with a significant competitive advantage versus smaller competitors . . . . We strategically conduct business with our top suppliers in order to optimize our scale advantages, but we also have the flexibility to source the majority of our products from a number of alternate suppliers when necessary.

\*\*\*

The principal competitive factors in our industry include the breadth, availability and pricing of products and services, technical knowledge and project planning capabilities, local expertise, as well as delivery capability and reliability. We believe that we are a leader in the local markets which we serve, and our national scale gives us meaningful competitive advantages compared to our smaller competitors. We believe there is a growing opportunity in our industry for both customers and suppliers to utilize distributors rather than directly sourcing from manufacturers.

(*Id.* pp. 121, 140.)

DSG is a North Dakota corporation, based in Fargo. DSG sells a number of products similar to Core and Main's offerings. (Compl. ¶9.) However, consistent with the description of Core and Main's competitive advantages in its S-1, DSG is not authorized and unable to sell certain products sold by Core & Main, or is not authorized and unable to sell such products in certain geographic areas. (May 2021 Form S-1 pp. 121, 140; Compl. ¶¶8, 17.) McCabe is a former employee of Core & Main who voluntarily resigned and a current employee of DSG. (Compl. ¶¶4-5, 11, Ex. C.)

## II. Core & Main's Purchase of Minnesota Pipe, the Employment Agreement, and the Integrated Noncompetition Agreement Later Signed by McCabe

In October 2017, Core & Main purchased the assets of Minnesota Pipe and Equipment Company ("**Minnesota Pipe**"). (Compl. ¶1, Ex. A.) McCabe was a minority shareholder and received consideration from the sale of Minnesota Pipe. (*Id.*) As a result

of Core & Main's acquisition of Minnesota Pipe, McCabe was required to sign two agreements drafted by Core & Main that contain restrictive covenants prohibiting certain competitive activities and solicitation, as well as the protection of Core & Main's Confidential Information. (*Id.* Ex. A; Declaration of Ronald McCabe ("**McCabe Decl.**") ¶3, Ex. 1.)

## A. The Employment Agreement and Its Restrictive Covenants Signed by McCabe on October 2, 2017

Core & Main offered McCabe employment as a Sales Representative on September 27, 2017. This offer letter and its attachments were drafted by Core & Main and provided proposed terms of an Employment Agreement between McCabe and the company.[3] (Compl. ¶¶3-4, Ex. A p. 1.) Among other terms, the "offered Employment Agreement [was] contingent on the closing of the sale of Minnesota Pipe and Equipment Company to Core & Main," which occurred on October 6, 2017. (*Id.* Ex. A at Employment Agreement p. 1; McCabe Decl. ¶4.)

Core & Main asserts that the restrictive covenants set forth in Sections F and G of the Employment Agreement, relate to, and are legally justified because:

> As part of the sale of Minnesota Pipe's assets, Defendant McCabe, as a[ minority] owner, sold his interest in customer lists and customer goodwill to Core and Main. After the sale, he remained interested in selling

---

[3] Core & Main has consistently referred to the Offer Letter and its attached and incorporated "Fiscal Year 2018 Sales Representative Compensation Plan" (the "**Compensation Plan**") and "General Rules - Outside Sales Representative Incentive Plans" (the "**Compensation Plan Rules**") as one combined Employment Agreement. (*See, e.g.*, Compl. ¶4 (referring to seven page Exhibit A as "a copy of the Employment Agreement"), Ex. A (Seven-page Employment Agreement); Ex. D at June 2, 2021, letter from Core & Main's counsel to DSG referring to eight-page agreement and attachments collectively as "Employment Agreement"); Ex. D at June 2, 2021, letter to McCabe.

waterworks products to Minnesota Pipe customers who became Core and Main customers as part of the transaction.

(ECF 7, Core and Main's Memorandum in Support of Motion for Preliminary Injunction (hereinafter, "**Core & Main's Injunction Memo.**") p. 3,; *see also id.* pp. 11-13; Compl. ¶¶1-4, 10-11.) The Employment Agreement's restrictive covenants included noncompetition and nonsolicitation provisions at Section F designed to limit McCabe's business activities during his employment and for a twelve-month period after that employment ended—defined in the Employment Agreement as the "Non-Competition Period."

During the Non-Competition Period, Section F stated that McCabe would not compete with Core & Main's business "within a 150 mile radius of each office location from which [he had] provided services on behalf of" Core & Main. (Compl. Ex. A at Employment Agreement §F(i).)[4] The Employment Agreement defined Core & Main's business as:

> purchasing, selling or distributing waterworks products and services, where products include, but are not limited to, various forms of pipe, valves, fittings, hydrants, meters, Geotextile fabric, pumps, valves, couplings, saws, manhole covers, drinking fountains, Scada systems/municipal water tower controls, and services include, but are not limited to, hydrant repair, polyethylene fusing, water and sewer main tapping, coring and estimating projects for public commercial projects; private projects and water/waste facilities.

(*Id.*) The only Core & Main "office location" from which McCabe provided services for Core & Main was the company's Farmington, Minnesota office. (McCabe Decl. ¶5;

---

[4] While the Complaint discusses the Employment Agreement's noncompetition provisions, it does not assert any claim or seek relief related to the noncompetition provision. (*See* Compl. ¶¶28-31, 34-37. Prayer for Relief ¶1.)

Compl. ¶1.) During his employment with the company, Core & Main did not provide a desk, cubicle, workstation, computer docking station, or office for McCabe at any Core & Main location other than the company's Farmington office. (McCabe Decl. ¶5.)

The Employment Agreement's non-solicitation provisions state that during the Non-Competition Period, McCabe would not

> directly or indirectly, (a) solicit or attempt to solicit business from any customer or supplier of [Core & Main] that was a customer or supplier of [Core & Main] during the one-year period prior to the date of your termination and including any prospective customers or suppliers with whom the company had contact during such one year period regarding doing business with [Core & Main]; or (b) solicit or attempt to solicit any such customer or supplier of [Core & Main] to reduce or end their business dealings with [Core & Main]; or (c) hire or cause the hiring of any employee of [Core & Main] or solicit any person or entity who is an employee or contractor of [Core & Main] to terminate his, her or its relationship with [Core & Main] without prior written approval of a duly authorized officer of [Core & Main].

(Compl. Ex. A § F.) The Employment Agreement attempts to justify Section F's noncompetition and nonsolicitation provisions, stating such restrictions are "reasonable and necessary in order to protect" Core & Main's "legitimate business interests, customer contacts, trade secrets, goodwill, and confidential information . . . ." (*Id.*) Core & Main does not attempt to support these interests except in relation to its purchase of Minnesota Pipe's customer goodwill.

Section G of the Employment Agreement related to Core & Main's Confidential Information, defined by the agreement to include:

> trade secrets, proprietary information, and all other information, data, knowledge, and knowhow relating to [Core & Main] and/or its business, practices, techniques, services or products, and that is delivered, made accessible, or disclosed by [Core & Main] to you prior to or after the date

> of this Agreement and include[ing], without limitation, customer or
> prospective customer information; pricing information; promotion,
> marketing and sales strategies; developing market information; reports and
> analyses; operational and economic data; studies; forecasts; financial
> models; management, sales and production techniques; research or business
> strategies; vendor and supplier information; distributor information;
> contracts and agreements; financial information; acquisition information or
> prospects; personnel and employment information; business strategies; and
> other information regarding [Core & Main], its business operations, and its
> current and prospective suppliers, distributors, and customers.

(*Id*. § G.) The Employment Agreement's definition of Confidential Information excluded

"information that is generally available to the public through no act or omission, directly

or indirectly" by McCabe in violation of the Employment Agreement. (*Id*.)

### B. Core & Main's Failure to Fulfill the Employment Agreement's Condition Precedent

The Employment Agreement referenced and attached commission information and

policies. The agreement required McCabe "to follow any policies or procedures of the

Company of which [he] had reasonable notice." (*Id*. § A) It also made clear that

McCabe's employment with Core & Main was "subject to the overall policies of the

Company." (*Id*. § B.) Pursuant to the Employment Agreement, McCabe was to be

"eligible for monthly commissions and year-end bonus in accordance with your C&M

compensation plans." (*Id*. § C.)[5]

The Employment Agreement included McCabe's applicable Sales Representative

"compensation plan" referenced in Section C(ii) of the Employment Agreement. Core &

Main's then-current year Sales Representative compensation plan—the "Fiscal Year

---

[5] A potential severance opportunity in the Employment Agreement was also tied to potential commissions. (*Id*. ¶ A.)

2018 Sales Representative Compensation Plan" (the "**Compensation Plan**")—was attached to the Employment Agreement. (Compl. Ex. A at Compensation Plan). Just above the signature line where McCabe was required to sign to accept the plan, the Compensation Plan stated:

> Please acknowledge receipt of this fully executed plan which includes this page and the attached page entitled "General Rules Outside Sales Representative Incentive Plans" by signing below and sending a copy to your Regional Vice President.

(Compl. Ex. A at Compensation Plan.)

The referenced "General Rules - Outside Sales Representative Incentive Plans" (the "**Compensation Plan Rules**") were also attached to the Employment Agreement and the Compensation Plan by Core & Main. (*Id.*) As relevant, the Compensation Plan Rules provide:

> III. Sales Representatives who are employees of the Company are expected to only work for the Company and not to engage in other employment that the Company deems detrimental or inappropriate. No Sales Representative Is allowed to perform work for others while functioning in the scope or capacity as the Company's Sales Representative.
>
> IV. ***No contractual agreements of any kind*** are said to exist between the Company and the Sales Representative that is ***not in writing and signed by the CEO***.

(*Id.* at Compensation Plan Rules III-IV (emphasis added).)

On October 2, 2017, McCabe signed the Employment Agreement and the Compensation Plan, and he initialed the Compensation Plan Rules where indicated on each document. (*Id.*) The CEO of Core & Main did not sign, and has never signed, the Employment Agreement after McCabe signed. (*Id.*)

### C. The Restrictive Covenants in the Integrated Noncompetition Agreement Signed by McCabe *After* Signing the Employment Agreement

As part of its purchase of Minnesota Pipe, Core & Main purchased customer lists, goodwill, and "other items" from the shareholders of Minnesota Pipe. (Compl. ¶1.) One such item purchased was the right to require McCabe and Minnesota Pipe's other shareholders to execute a Noncompetition Agreement (the "**Noncompetition Agreement**"). (McCabe Decl. ¶4, Ex. 1.)[6] As a condition precedent to Core & Main's purchase of Minnesota Pipe's customer lists, customer goodwill, and other assets, Core & Main required each of Minnesota Pipe's shareholders, including McCabe, to sign and accept the Noncompetition Agreement drafted by Core & Main. (*Id*. Ex. 1 at Recitals A-C; *id*. ¶4.) The agreement referenced the "Asset Purchase Agreement" (the "**APA**") and explained that the Noncompetition Agreement was executed "to induce [Core & Main] to consummate" the APA's transaction. (*Id*. p. 1.)

The Noncompetition Agreement included noncompetition restrictions at Section 2, nonsolicitation restrictions at Section 3, and restrictions on the use of Confidential Information at Section 5. Section 2 of the Noncompetition Agreement restricted McCabe from competing with Core & Main for a two-year period beginning on October 6, 2017, the date McCabe and other Minnesota Pipe shareholders executed the agreement.

---

[6] Core & Main's Complaint fails to mention the Noncompetition Agreement in its Complaint. However, this agreement is embraced by the pleadings as part of Core & Main's purchase of Minnesota Pipe's assets discussed at several points in the Complaint and because it relates to and superseded the Employment Agreement that forms the bases of several of Core & Main's claims. *See, e.g.*, *Mattes v. ABC Plastics, Inc.*, 323 F.3d 695, 698 n. 4 (8th Cir. 2003) (finding contracts that were not attached to the Complaint, but that related to the claims therein to be embraced by the pleadings).

(McCabe Decl. ¶4, Ex. 1 §§1-2.) During this period, Section 2.1 of the Noncompetition Agreement prohibited McCabe from directly or indirectly engaging in Core & Main's Business in "the States of Minnesota, Wisconsin, North Dakota, South Dakota and Iowa" unless such activity was undertaken "on behalf of" Core & Main, such as through employment by the company. (*Id.* Ex. 1 § 1, 2.1.) The Noncompetition Agreement defined Core & Main's "Business" using identical language as the definition of Core & Main's "business" in the Employment Agreement. (*Id.* §1.)

Section 3 of the Noncompetition Agreement—its nonsolicitation provisions— provided that McCabe would not

> directly or indirectly: (i) solicit, induce or influence any individual employed at any time during the [two-year noncompetition] Term by [CORE & MAIN] or by any affiliate of [CORE & MAIN] to terminate his or her employment relationship with [CORE & MAIN] or such affiliate; (ii) otherwise interfere with such employment relationship; or (iii) adversely interfere with any Business relationship of [CORE & MAIN] (including any relationship with any client or supplier of [CORE & MAIN]).

(*Id.* § 3.)

Finally, Section 5 of the Noncompetition Agreement restricted McCabe's use of Core & Main's Confidential Information, defined by the agreement using similar and overlapping language as used to define Confidential Information in the Employment Agreement. (*Id.* § 5.)

While the Employment Agreement contained no choice of law provision, the Noncompetition Agreement expressly provided that the

> Agreement and the rights and obligations of the parties hereunder are to be governed by and construed and interpreted in accordance with the laws of

the State of Missouri applicable to contracts made and to be performed wholly within Missouri, without regard to choice or conflict of laws rules.

(*Id*. § 12.)

The Noncompetition Agreement included a broad integration provision, stating:

This Agreement constitutes the entire agreement by and between the parties pertaining to the subject matter hereof and supersedes all prior or contemporaneous agreements, letters of intent, understandings, negotiations and discussions of the parties, whether oral or written**.**

(*Id*. § 9 (second emphasis added).) Unlike the Employment Agreement, the CEO of Core & Main signed the Noncompetition Agreement on or about October 6, 2017. (*Id*. p. 5 (signature page with CEO signature).)

## III.    McCabe's Decision to Leave Core & Main and Accept Employment with DSG

McCabe resigned from his position with Core & Main on June 1, 2021. (Compl. ¶¶5, 11, Ex. F; McCabe Decl. Ex. 2.)[7] His resignation email stated:

Rick, please accept this email as my letter of resignation. I will not be a salesman at my new job so I will not be violating my no compete.

We have talked several times in the past of my issues with certain people and practices at Core and Main. I can no longer work with these conditions.

It is unacceptable for someone to change sales orientation on invoices, I wonder how many times it happened when I didn't find out about it,

Lobbying for customers to switch salesman, or management changing salesman depending on size of meter job being bid.

These are just a few of reasons I chose to accept a new job.

---

[7] Exhibit 2 to McCabe's Declaration includes the same text as Exhibit F to the Complaint. However, Core & Main or its counsel has apparently cut and pasted or otherwise altered the message in a manner that inaccurately creates an appearance of redaction or other alteration. (McCabe Decl. Ex. 2.)

I realized nothing will change after our lunch a couple of weeks ago. I no longer have trust in Core and Main.

I expect to still receive commission on all product I sold to date and would appreciate the opportunity to keep my phone number for personal use as it was my personal number before we were bought out. I will agree to an exit interview if you would like, just give me a date and time.

My truck and sales samples are in my driveway let me know arrangements for its return.

Thank you for all that you did and tried to do for me. I consider you a friend and a great boss.

(Compl. Ex. F; McCabe Decl. ¶8, Ex. 2.) McCabe has never used or disclosed Core & Main's confidential or proprietary information except as part of his form duties as an employee of Core & Main. (McCabe Decl. ¶8.)

## **ARGUMENT**

### I.    **Rule 12(b) and Rule 12(d) Legal Standards**

Defendants move to dismiss Core & Main's claims pursuant to Rule 12(b)(6) because the Complaint fails to state a claim upon which relief can be granted. To survive a motion to dismiss brought pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although a complaint need only present a short and plain statement of a claim's factual allegations, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). The plausibility standard requires a plaintiff to show at the pleading stage that success on the merits is more than a

"sheer possibility." *Braden v. Wal–Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009) (citation omitted). The plaintiff must offer factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).

While the Court ordinarily does not consider matters outside the pleadings when considering a motion to dismiss, the Court may consider materials that are necessarily embraced by the pleadings, incorporated by reference or integral to the claim, as well as items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned. *See, e.g.*, *Mattes v*, 323 F.3d at 697 n. 4; *Miller v. Redwood Toxicology Lab., Inc.*, 688 F.3d 928, 931 n. 3 (8th Cir. 2012) (quoting 5B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (3d ed. 2004)); *Florida State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 663 (8th Cir. 2001) (taking judicial notice of SEC filings in deciding a Rule 12(b)(6) motion). To the extent the Court considers materials or testimony that go beyond the pleadings, Defendants move in the alternative for summary judgment pursuant to Rule 12(d) and Rule 56. *See* Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.").

On a converted motion for summary judgment, all parties must be given a reasonable opportunity to present all the materials pertinent to the motion. However, Rule 56 "does not require trial courts to allow parties to conduct discovery before

entering summary judgment." *United States v. Light*, 766 F.2d 394, 397 (8th Cir. 1985); *see also Herman v. Coloplast Corp*., Civ. No. 16-1213 (MJD/BRT), 2016 WL 7042191 at *6 (D. Minn. Nov. 9, 2016 (converted motion for summary judgment granted prior to discovery); *Barrera v. U.S. Dept. of Homeland Sec*., Civ. No. 07-3879 (JNE/SRN), 2009 WL 825787 at *10 (D. Minn. Mar. 27, 2009).

> If extra-pleading evidence "is comprehensive and will enable a rational determination of a summary judgment motion," a district court will be more likely to convert to summary judgment, but "when it is scanty, incomplete, or inconclusive," the district court is more likely to decline to convert to summary judgment and permit further discovery.

*Proctor v. D.C.*, 74 F. Supp. 3d 436, 448 (D.D.C. 2014) (quoting 5C Charles Alan Wright, et al., *Federal Practice & Procedure* § 1366 (3d ed. 2012)). Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is appropriate where, as here, the material facts are not in dispute, and the Court need only apply the law to the facts in the record. *See, e.g.*, *Eisenrich v. Minneapolis Retail Meat Cutter*s, 282 F.Supp. 1077, 1080-81 (D. Minn. 2003).

## II.    Core & Mains Claims Based on the Employment Agreement Fail for Multiple, Alternative and Independent Reasons

Core & Main's claims based on alleged violations of the Employment Agreement fail because the Employment Agreement was never effective or, alternatively was superseded four days after McCabe signed it by McCabe's and Core & Main's CEO's execution of the Noncompetition Agreement.

A.    **The Employment Agreement Never Became Effective Because Core & Main's CEO Did Not Fulfill a Condition on the Agreement Becoming Effective that was Selected and Drafted by Core & Main**

The Employment Agreement's unambiguous terms—chosen and drafted by Core & Main—required the company's CEO to sign any "contractual agreements of any kind" in order for a bind contract to "exist between the Company and [McCabe, a] Sales Representative." (Compl. ¶¶4-5, Ex. A at Compensation Plan Rules §IV.) While McCabe signed Core & Main's offer of employment as a Sales Representative and each document of the Employment Agreement, Core & Main's CEO did not. (*Id*.) As a result, the Employment Agreement never became effective and does not bind McCabe.

"Unambiguous contract language must be given its plain and ordinary meaning, and shall be enforced by courts even if the result is harsh." *Minneapolis Pub. Hous. Auth. v. Lor*, 591 N.W.2d 700, 704 (Minn. 1999); *see also W. Forms, Inc. v. Pickell*, 308 F.3d 930, 933 (8th Cir. 2002) (applying Missouri law).[8] The determination of whether a contract is ambiguous is a question of law for a court to decide. *Republic Nat'l Life Ins. Co. v. Lorraine Realty Corp*., 279 N.W.2d 349, 354 (Minn. 1979); *W. Forms, Inc.*, 308 F.3d at 933. The dispositive language here is unambiguous: "No contractual agreements of any kind are said to exist between the Company and the Sales Representative that is

---

[8] Defendants believe that Missouri law must be applied to Core & Main's claims under the Employment Agreement claims. Nonetheless, consistent with Rule 12(b)(6)'s standard, and because the Complaint should be dismissed with prejudice regardless of whether Minnesota or Missouri law is applied by the Court. *See, e.g.*, *Leonards v. S. Farm Bureau Cas. Ins. Co*., 279 F.3d 611, 612 (8th Cir. 2002) (finding court need not resolve choice of law dispute because issue was a "false conflict [and[ the relevant legal principles are the same in both states with respect to the issue that we find dispositive."); *Smith v. Questar Cap. Corp*., No. 12-CV-2669 SRN/TNL, 2013 WL 3990319, at *10 (D. Minn. Aug. 2, 2013) (citing *Leonards* and applying its "false conflict" principle to dismiss claim with prejudice on Rule 12(b)(6) motion).

not in writing and signed by the CEO." (Compl. Ex. A. at Compensation Plan Rules §
IV.) When the contract language is clear, "the rights and responsibilities of the parties are
to be determined by examining the four corners of the relevant documents." *Fox Sports
Net Minnesota, LLC v. Minnesota Twins P'ship*, No. CIV. 01-961DSDSRN, 2002 WL
1001057, at *4 (D. Minn. May 6, 2002), *aff'd sub nom. Fox Sports Net N., L.L.C. v.
Minnesota Twins P'ship*, 319 F.3d 329 (8th Cir. 2003); *see also CitiMortgage, Inc. v.
Chicago Bancorp, Inc*., 808 F.3d 747, 751 (8th Cir. 2015) ("Like Minnesota courts,
Missouri courts interpret a contract to give effect to the parties' intent and, when a
contract is unambiguous, intent 'is discerned solely from the contract's language.'")
Courts may not "create an ambiguity in order to distort the language of an unambiguous
[contract], or, in order to enforce a particular construction which it might feel is more
appropriate" than the contract's plain language. *Rodriguez v. Gen. Acc. Ins. Co. of Am*.,
808 S.W.2d 379, 382 (Mo. 1991); *Minneapolis Pub. Hous. Auth.*, 591 N.W.2d at 704.

Core & Main drafted and included an express limitation on its mode of
acceptance—that its CEO must sign "contractual agreements of any kind" to form a
binding agreement with McCabe. (Compl. Ex. A at Compensation Plan Rules § IV.) If a
contract "offer prescribes the mode of acceptance, ***that limitation will be honored***." *Cal
Caulfield & Co. v. City of Belton*, 687 S.W.2d 207, 209 (Mo. Ct. App. 1984) (emphasis
added) (citing *Shortridge v. Ghio*, 253 S.W.2d 838, 845 (Mo. Ct. App. 1952)); *see also
Hearing Assocs., Inc. v. Downs*, No. A16-1317, 2017 WL 2414852, at *4 (Minn. Ct.
App. June 5, 2017) ("If an offer limits the manner of acceptance, the acceptance must
comply with the terms of the offer.") (citing Restatement (Second) of Contracts § 60

(1981)). Presumably, Core & Main chose to include this limitation to avoid inadvertent contracts with its salespeople, such as changes to commission rates or a contract of employment for a definite term. However, even if the provision was a mere typo or other error, the Court must construe such error against the drafter and Core & Main must live with the "consequence[s] of [its] poor drafting . . . ." *W. Forms, Inc.*, 308 F.3d at 933; *Ecolab, Inc. v. Gartland*, 537 N.W.2d 291, 295 (Minn. Ct. App.1995) ("[W]here a contract is open to two interpretations, the one more favorable to the party who did not draft the instrument should be adopted in the absence of a clear showing that a contrary meaning was intended by the parties at the time of its execution.") (quoting *Wick v. Murphy*, 54 N.W.2d 805, 809 (Minn. 1952).

Core & Main's CEO was obviously capable of executing contracts when he believed they were important, as shown by his execution of the Noncompetition Agreement. (McCabe Decl. Ex. 1 p. 5.) He simply chose not to sign the Employment Agreement. This failure prevented the Employment Agreement from becoming enforceable. As a result, the agreements do not bind McCabe and cannot form the basis for Core & Main's claims in the Complaint.

### B. Even If the Employment Agreement Became Effective, the Noncompetition Agreement Superseded and Replaced the Employment Agreement and Its Restrictive Covenants

Even if Core & Main's CEO had properly signed and accepted the Employment Agreement (he did not), McCabe's and the CEO's execution of the Noncompetition Agreement on October 6, 2017, extinguished the Employment Agreement and its noncompetition, nonsolicitation, and confidentiality provisions at issue here. The

Noncompetition Agreement's integration provision, Section 9, unequivocally superseded and voided "all prior or contemporaneous agreements, letters of intent, understandings, negotiations and discussions of the parties, whether oral or written." (McCabe Decl. Ex. 1 § 9.) As such, and because the noncompetition and nonsolicitation restrictions in the Noncompetition Agreement expired in 2019, and Core & Main's claims in this action fail as a matter of law.

"A written agreement is integrated if it represents a final expression of one or more terms of the agreement." *Rosenfeld v. Boniske*, 445 S.W.3d 81, 87 (Mo. Ct. App. 2014) (quoting *State v. Maryville Land P'ship*, 62 S.W.3d 485, 489 (Mo. Ct. App. E.D.2001).[9] Where the contract contains an integration or merger clause, the "law conclusively presumes all prior and contemporaneous agreements have been merged into a written contract." *Id.* at 88 (quoting *Jennings v. SSM Health Care St. Louis*, 355 S.W.3d 526, 532 (Mo. Ct. App. 2011) The presence of a merger clause "announces and demonstrates the all-inclusive nature of the written instrument and furnishes additional reason for applying the parol evidence rule." *Id*. (quoting *Union Elec. Co. v. Fundways, Ltd*., 886 S.W.2d 169, 171 (Mo. Ct. App. 1994)).

The Noncompetition Agreement's Section 9 includes two clauses, both of which are independently capable of eliminating Core & Main's claims based on the

---

[9] "Missouri recognizes that contracting parties may choose the state whose law will govern the interpretation of their contractual rights and duties." *Tri-Cty. Retreading, Inc. v. Bandag Inc*., 851 S.W.2d 780, 784 (Mo. Ct. App. 1993); *see also St. Jude Med. S.C., Inc. v. Biosense Webster, Inc*., 818 F.3d 785, 788 (8th Cir. 2016) (("[U]nder Minnesota law a contractual choice-of-law provision will govern so long as the parties " 'act[ed] in good faith and without an intent to evade the law.'") (quoting *Medtronic, Inc. v. Gibbons*, 684 F.2d 565, 568 (8th Cir. 1982).

Employment Agreement. The first clause provides that the "Agreement constitutes the entire agreement by and between the parties pertaining to the subject matter hereof . . ." (McCabe Decl. Ex. 1 § 9.) The second clause states that the Noncompetition Agreement "supersedes all prior or contemporaneous agreements, letters of intent, understandings, negotiations and discussions *of the parties*, whether oral or written," without reference to the subject matter of the Noncompetition Agreement. (*Id.* (emphasis added).)[10] Applying this plain language, the October 6, Noncompetition Agreement supersedes the Employment Agreement signed by McCabe on October 2. The Employment Agreement is a "prior or contemporaneous agreement[]" between McCabe and Core & Main. As such, it was superseded by the Noncompetition Agreement's Section 9 and Core & Main's claims dependent on the Employment Agreement must be dismissed.

While the Court need not apply the first clause of Section 9 because of its more comprehensive second clause, Core & Main's contract-based claims independently fail by operation of this first clause as well based on the subject matter of the two agreements. At a minimum, the Noncompetition Agreement, superseded all agreements between the parties "pertaining to the subject matter" of the Noncompetition Agreement—the restrictive covenants that Core & Main believed were necessary to protect the assets it purchased from Minnesota Pipe. (*Id.* § 9.)

For purposes of this motion, Defendants and the Court must accept Core & Main's plausible factual allegations as true. Core & Main's Complaint and Injunction Memo.

---

[10] The Noncompetition included a cross-reference to the APA and, therefore, did not supersede that agreement.

explain that the Employment Agreement was adopted to protect the customer lists and

customer goodwill sold by Minnesota Pipe to Core & Main. (Core & Main's Injunction

Memo. pp. 1, 3-4, 11-13, 18-20.) [11] As it explained in its argument:

> Core and Main purchased Minnesota Pipe's (and McCabe's interest in
> Minnesota Pipe) customer list and goodwill and hired him on the express
> condition that he agree to the non-compete, non-solicitation, and
> confidentiality provisions in his Employment Agreement.

(*Id*. p. 13.) Core & Main later adds:

> McCabe is threatening to destroy the goodwill between Core and Main and
> its customers; he sold those customer lists and the goodwill of those
> customers to Core and Main when it purchased Minnesota Pipe's assets.

(*Id*. p. 18 (emphasis added); *see also* Compl. ¶¶1-3, 20.)

At paragraph 20 of the Complaint and in its memorandum's arguments, Core &

Main alleges that the Minnesota Supreme Court's 1974 decision of *Haynes v. Monson*

and other decisions applying Minnesota law to a restrictive covenant executed in the

context of a sale of a business, controls the outcome of the contracts claims at issue in

this action. (*Id*. (quoting *Haynes v. Monson*, 224 N.W.2d 482, 483-84 (Minn. 1974)). In

light of its allegations, arguments, and cited authority, Core & Main inescapably believes

---

[11] Other than recitations of "goodwill" without any specific facts, the only specific goodwill
mentioned by Core & Main is customer goodwill sold along with the other assets of Minnesota
Pipe. While Core & Main references confidential information, it does not attempt to justify the
Employment Agreement based on McCabe's receipt of Core & Main's confidential information
other than referring to Minnesota Pipe's sale of "customer list." Such information is not
generally considered confidential. *See, e.g*., *Lasermaster Corp. v. Sentinel Imaging*, a Div. of
Sentinel Bus. Sys., Inc., 931 F. Supp. 628, 637 (D. Minn. 1996); *Ahlers v. CFMOTO
Powersports, Inc*., No. CIV. 13-1221 DSD/JSM, 2014 WL 2574747, at *4 (D. Minn. June 9,
2014) (citing *Blackburn, Nickels & Smith, Inc. v. Erickson*, 366 N.W.2d 640, 645 (Minn. Ct.
App. 1985)); *Brown v. Rollet Bros. Trucking Co*., 291 S.W.3d 766, 777 (Mo. Ct. App. 2009).
Because Core & Main sells to municipal and public entities, its customers are easily identifiable
using Google and search for "core & main" and a city's name.

the subject matter of the Employment Agreement's restrictive covenants is to protect the customer goodwill and assets that Minnesota Pipe sold to Core & Main.[12] Of course, this is also the inescapable subject of the Noncompetition Agreement that was executed by all of Minnesota Pipe's shareholders and Core & Main's CEO on the closing date of the asset sale to Core & Main. (McCabe Decl. Ex. 1.)

Because both the Employment Agreement and the Noncompetition Agreement covered the same subject matter. The later-adopted Noncompetition Agreement's integration provision, Section 9, mandates that the Noncompetition Agreement supersedes the Employment Agreement. *See Dill v. Poindexter Tile Co*., 451 S.W.2d 365, 370 (Mo. App. 1970); *Maday v. Grathwohl*, 805 N.W.2d 285, 289 (Minn. Ct. App. 2011). The Employment Agreement was superseded by the later-adopted Noncompetition Agreement and is no longer in effect. As a result, the Employment Agreement cannot form the basis for Core & Main's contract-based claims.

### C. Even if the Employment Agreement Became Effective and the Agreement Was Not Superseded by the Noncompetition Agreement, Core & Main Offers No Legitimate Interests Sufficient to Justify the Employment Agreement's Restrictive Covenants

Even if Core & Main had properly accepted the October 2 Employment Agreement and the integration provision in the October 6 Noncompetition Agreement did not extinguish the Employment Agreement, Core & Main fails to plead any legitimate

---

[12] Core & Main has attempted to gain advantage in this action by asking the Court to apply the more lenient restrictive covenant standard applied to covenants arising from the sale of a business—such as applied in *Haynes*. Core & Main also failed to inform the Court of the existence of the superseding Noncompetition Agreement. Because of this, Core & Main waived its right to characterize subject matter of the Employment Agreement differently than it pleaded in the Complaint.

business interest that could justify the restrictive covenants in the Employment Agreement. As such, the restrictive covenants are unenforceable as a matter of law.

In Minnesota, restrictive covenants in employment agreements "are looked upon with disfavor, cautiously considered, and carefully scrutinized." *Kallok v. Medtronic, Inc.*, 573 N.W.2d 356, 361 (Minn. 1998); *Healthcare Servs. of the Ozarks, Inc*. v. Copeland, 198 S.W.3d 604, 610 (Mo. 2006). To enforce any post-employment restrictions, Core & Main must offer specific allegations regarding the nature of its business and of McCabe's services sufficient to justify the restrictions at issue. *See, e.g.*, *Eutectic Welding Alloys Corp. v. West*, 160 N.W.2d 566, 571 (Minn. 1968); *Healthcare Servs. of the Ozarks*, 198 S.W.3d at 610.

The Employment Agreement's noncompetition and nonsolicitation restrictions may only be enforced if such evidence demonstrates "a legitimate employer interest" and that the restrictions at issues "are not broader than necessary to protect this interest." *Kallok*, 573 N.W.2d at 361; *see also Klick v. Crosstown State Bank of Ham Lake, Inc*., 372 N.W.2d 85, 87 (Minn. Ct. App. 1985). "Legitimate interests that may be protected include the company's goodwill, trade secrets, and confidential information." *Medtronic, Inc. v. Advanced Bionics Corp*., 630 N.W.2d 438, 456 (Minn. App. 2001); *see also Midwest Sign & Screen Printing Supply Co. v. Dalpe*, 386 F. Supp. 3d 1037, 1055–56 (D. Minn. 2019). General, conclusory assertions of goodwill or other potential interests are insufficient  *See, e.g.*, *Midwest Sign*, 386 F. Supp. 3d at 1055–56 (finding allegations regarding "customer goodwill in general, 'conclusory terms and without citation to evidence'" do not justify a restraint) (citing *Mgmt. Registry, Inc. v. A.W. Cos*., No. 17-cv-

5009 (JRT/FLN), 2018 WL 461132, at *6 (D. Minn. Jan. 16, 2018), *aff'd*, 920 F.3d 1181 (8th Cir. 2019)); *see also Virtual Radiologic Corp. v. Rabern*, No. 20-CV-0445 (PJS/BRT), 2020 WL 1061465, at *3 (D. Minn. Mar. 5, 2020); *Healthcare Servs. of the Ozarks*, 198 S.W.3d at 611.

After pretending the Noncompetition Agreement did not exist, Core & Main seeks to justify the Employment Agreement's restrictive covenants by recycling the interests that might justify the Noncompetition Agreement. While the purchase of Minnesota Pipe's "customer list and goodwill," may have been sufficient to justify the Noncompetition Agreement—with restrictions that expired in 2019. The same interests that might justify the expired Noncompetition Agreement cannot be used to justify the Employment Agreement's covenants extending an additional three years. To be enforced, Minnesota restrictive covenants may not be "broader than necessary to protect th[e] interest" cited by the former employer. *Gavaras v. Greenspring Media, LLC*, 994 F. Supp. 2d 1006, 1010 (D. Minn. 2014) (citing *Hutchinson Tech. Corp. v. Magnecomp Corp.*, No. 06–1703, 2006 WL 2061707, at *3, 2006 U.S. Dist. LEXIS 48391, at *7 (D. Minn. July 17, 2006)); *Healthcare Servs. of the Ozarks*, 198 S.W.3d at 610 ("a non-compete agreement is reasonable if it is no more restrictive than is necessary to protect the legitimate interests of the employer.") (citing *American Pamcor, Inc., v. Klote*, 438 S.W.2d 287, 290 (Mo.App.1969)). Core & Main has not alleged any interest related to McCabe's employment that could justify any restrictive covenant or extend its earlier interests that could have justified the Noncompetition Agreement. As a result, claims based on the restrictive covenants in the Employment Agreement fail as a matter of law.

III.    **Each of Core & Main's Claims Fail as a Matter of Law, Even if the Employment Agreement Existed**

Core & Main's Complaint is replete with baseless innuendo. However, even if its allegations are accepted  as true and even if the Employment Agreement is in effect and its restrictions could be justified—it is not and they cannot—Core & Main's claims independently fail as a matter of law.

A. **Core & Main's Breach of Duty of Loyalty Against McCabe Fails as a Matter of Law**

Core & Main's Count I alleges a breach of the common law duty of loyalty and of Section B of the Employment Agreement. This claim fails as a matter of law because McCabe did not engage in the conduct alleged and Core & Main has not undertaken the investigation necessary to properly allege this claim. The only allegation offered in support of Count I is that

> McCabe breached these duties by diverting business from [American Flow Control ("**AFC**")] in Faribault, Minnesota to Mueller, thereby endangering the relationship between AFC, a principal supplier of Core and Main, and Core and Main. These actions damaged the relationship between Core and Main and AFC, thus entitling Core and Main to damages for both breach of contract, and also for violating the common law duty of loyalty.

(Compl. ¶23.) However, Core & Main knows, or could know if it had properly investigated, that its allegations are false. *See* Fed. R. Civ. P. 11(b)(2)-(3). McCabe did not divert Faribault, Minnesota's business from AFC to Mueller. This allegation is false, relying solely on double-hearsay rumors. (McCabe Decl. ¶6; Declaration of Michael Lane ("**Lane Decl.**") ¶¶3-5.)

Core & Main's allegation is based on a rumor reported by Michael Lane that he heard from AFC salesperson, Mark Garrison. (Lane Decl. ¶¶3-5; Core & Main's Injunction Memo. pp. 4-5.) Core & Main does not offer testimony from any person with knowledge of why Faribault changed its specification. In fact, Faribault changed its specification based on the actions of a Mueller sales representative Doug Kilanowski, and not by any action of McCabe. (McCabe Decl. ¶6.) As such, the Complaint's Count I fails as a matter of law and must be dismissed.[13]

### B. Core & Main's Breach of Confidentiality Restrictions Against McCabe Fails as a Matter of Law

Core & Main's Count II alleges that McCabe violated Section B of the Employment Agreement. This claim fails because the Employment Agreement was never or is no longer in effect. (*See supra* pp. 9-13.) Even if the agreement were in effect, Core & Main's alleged breach claim cannot satisfy the *Iqbal/Twombly* plausibility standard. Core & Main offers only "labels and conclusions" that fail as a matter of law. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

The only facts that Core & Main allege regarding its alleged confidential information arise from a communication from Defendants' counsel stating:

> Your characterization of Mr. McCabe's text message is simply not plausible. It does appear plausible, however, that your June 2 letters arise from CM's desire to retaliate in response to concerns regarding CM's business practices raised by Mr. McCabe with CM on June 1. While these issues do not involve DSG or motivate its actions, both of my clients trust

---

[13] Count I is the only claim as to which Defendants believe that the Court must consider McCabe's declaration testimony. Summary judgment is appropriate because Core & Main offers no admissible evidence in support of its claim and McCabe unequivocally denies the alleged wrongful behavior. (McCabe Decl. ¶6.)

that any impulse to retaliate will not unlawfully motivate any of CM's actions, or further actions.

(Compl. Ex. E p. 1.) This statement contains no confidential information and only references information in McCabe's resignation email. (Compl. Ex. F; McCabe Decl. Ex. 2.) Inexplicably, Core & Main alleges that this paragraph demonstrates that counsel for Defendants is "familiar with Core and Main's internal business practices" and that McCabe shared information with counsel and DSG regarding:

> How Core and Main bills [*sic*] decides to bill for its products and services, and how it chooses to give credit to salespersons for their work when two or more salespersons serve one customer is confidential and proprietary information that is not disseminated outside of Core and Main; the information concerns how profits are made and divided up.

(Compl. ¶13.) Core & Main then further alleges that

> for both DSG and McCabe to state that this information does not involve DSG only serves to show that the information was recklessly and wantonly shared in violation of the Agreement's confidentiality provision at Paragraph G. It puts Core and Main at a competitive disadvantage to one of its principal competitors in the area, DSG

(*Id.*) [14] Core & Main's conclusory allegations are absurd and must be dismissed. (McCabe Decl. ¶¶7-8.)

---

[14] While not referenced in its Complaint, Core & Main's Injunction Memo. alleges that McCabe engaged in "destruction of company cell phone records." (Core & Main's Injunction Memo. pp. 5-6.) Once again, Core & Main deceptively withholds dispositive information on this issue. The "cell phone records" alleged to be at issue, were McCabe's, not Core & Main's. (McCabe Decl. ¶7.) McCabe did not delete Core & Main's records, he simply removed his personal iCloud account from the phone to use on his next phone and removed his personal photos and information. (*Id.*) If Core & Main had not wanted him to do so, it should have provided a company cell phone account or provided some other way to separate its employees' personal photos and information from their company cell phone account. (*Id.*) Finally, Core & Main did not need McCabe's iCloud account to determine who McCabe called, as it could just review the phone bills that it received and paid. (*Id.*)

### C. Even if the Employment Agreement Were Binding, Core & Main's Nonsolicitation Claim Fails As a Matter of Law

While replete with innuendo regarding the Employment Agreement and McCabe's alleged activities, Core & Main's Complaint only asserts one alleged breach of the agreement's noncompetition and nonsolicitation provisions set forth in paragraph 31 of the Complaint. That paragraph states:

> McCabe breached the Agreement by directly or indirectly soliciting, enticing, attempting to solicit, and attempting to entice Core and Main customers with whom he had a direct relationship to engage in business with him during the time period in the agreement proscribing such competition.

(Compl. ¶31.)

Reading the Complaint as a whole, it appears that paragraph 31's generic allegations relate to the more specific allegations in paragraph 15-20 related to training McCabe provided as a volunteer on behalf of the Minnesota Rural Water Association ("**MRWA**"). MRWA is a nonprofit that provides "training and technical assistance to small municipal and non-municipal systems, rural water districts, and wastewater districts with populations less than 10,000."[15] Core & Main alleges that by fulfilling his earlier commitment to volunteer and provide training for the MRWA, including regarding "installation and maintenance of AFC fire hydrants, a product that neither he nor DSG is authorized to sell . . . . [McCabe] was soliciting for business in his new position as a representative of DSG." (Compl. ¶¶17, 19.) Core & Main's Complaint does not allege that McCabe did a poor job training on Core & Main's product that DSG does not sell, or

---

[15] *See* http://www.mrwa.com/about.html (accessed July 19, 2021). MRWA's website is embraced by the Complaint because pages from the site are attached as Exhibits G and K.

how training on **Core & Main's** products would benefit **DSG** or could constitute solicitation for DSG. Nor does the Complaint allege that McCabe sold, attempted to sell, solicited, attempted to solicit, or that McCabe otherwise engaged in any activity that is remotely prohibited by the nonsolicitation provisions of the Employment Agreement in relation to any person, anywhere, let alone in relation to any person who attended the MRWA seminar. To state a claim based on an alleged breach of a contract, a plaintiff must allege a plausible breach. As such, Core & Main's claim for breach of the Employment Agreement's nonsolicitation provision, County III, would fail as a matter of law, even if the Employment Agreement was otherwise enforceable.

### D. Core & Main's Tortious Interference with Contract Claim Fails as a Matter of Law

To succeed on its tortious interference with Contract claim against DSG, Core & Main must demonstrate that McCabe has breached an enforceable contract.. *See Midwest Sign & Screen Printing Supply*, 386 F. Supp. 3d at 1054 ("This tortious-interference claim, then, rises and falls on the success of Midwest's breach-of-contract claims."); *AgInformationData, LLC v. Integrated Solutions Grp., Inc.*, No. 11-3673, 2014 WL 4348209, at *12 (D. Minn. 2014) (holding tortious interference claim could not survive after the Court ruled the non-compete was unreasonable and unenforceable). If Core & Main were to prove a breach, DSG could of course prove its offer to hire McCabe falls within the competitor's privilege. *See, e.g.*, *Cenveo Cotp. v. Southern Graphic Sys., Inc.*, 784 F. Supp. 2d 1130, 1140 (D. Minn. 2011) (holding no tortious interference where a competitor "simply made a better offer," because "a competitor is entitled to compete").

Regardless, Core & Main's Count IV fails because it has not and cannot demonstrate a breach of contract by McCabe.

### E. Core & Main's Tortious Interference with Prospective Contractual Relations Fails as a Matter of Law

Core & Main's claim for tortious interference with prospective contractual relations fails as a matter of law. In Minnesota, such a claim is known as tortious interference with prospective economic advantage. *See Gieseke ex rel. Diversified Water Diversion, Inc. v. IDCA, Inc*., 844 N.W.2d 210, 216 and n. 5 (Minn. 2014). To state this claim, Core & Main must prove five elements:

1) The existence of a reasonable expectation of economic advantage;
2) Defendant's knowledge of that expectation of economic advantage;
3) That defendant intentionally interfered with plaintiff's reasonable expectation of economic advantage, and the intentional interference is either independently tortious or in violation of a state or federal statute or regulation;
4) That in the absence of the wrongful act of defendant, it is reasonably probable that plaintiff would have realized his economic advantage or benefit; and
5) That plaintiff sustained damages.

*Gieseke*., 844 N.W.2d at 219. Core & Main does not attempt to offer evidence of these elements. (Compl. ¶¶ 38-40.) As such, this claim must be dismissed.

### CONCLUSION

Core & Main's Complaint does not contain sufficient factual allegations to state a claim to relief that is plausible on its face. Core & Main's mere "labels and conclusions" cannot overcome the indisputable agreements at issue or fulfill applicable legal standard.

Because its claims fail as matter of law, the Complaint should be dismissed with prejudice.

Dated: July 19, 2021                           **CROSSCASTLE PLLC**

                                               */s/Samuel W. Diehl*
                                               Samuel W. Diehl (#0388371)
                                               333 Washington Avenue North
                                               Suite 300-9078
                                               Minneapolis, MN 55401
                                               p. 612.412.4175
                                               f. 612.234.4766
                                               sam.diehl@crosscastle.com

                                               ***Counsel for Defendants Ron McCabe
                                               and Dakota Supply Group, Inc.***

4818-2925-2849, v. 4